UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

MARC LARSON,                                         Case No. 3:17-cv-01040-AC

                        Plaintiff,                   OPINION AND ORDER

        v.

OREGONIAN PUBLISHING
COMPANY LLC dba OREGONIAN
MEDIA GROUP,

                        Defendants.
_____

ACOSTA, Magistrate Judge:

*Introduction*

        Plaintiff Marc Larson ("Larson") is suing his former employer, defendant Oregonian

Publishing Company LLC dba Oregonian Media Group ("Oregonian"), alleging he was terminated

for requesting medical leave and because he is disabled.  Currently before the court is Oregonian's

motion for summary judgment on Larson's claims for violation of the Family and Medical Leave Act

(29 U.S.C. §§ 2601- 2654)("FMLA"), the Oregon Family Leave Act (OR. REV. STAT. §§ 659A.150-659A.186 )("OFLA"), the American with Disabilities Act (42 U.S.C. §§ 12101-12300)("ADA"), and the Oregon Rehabilitation Act (OR. REV. STAT. §§ 659A.103-659A.145)("ORA"), and for wrongful termination.[1]

The court finds Larson failed to establish the causal connection between Oregonian's decision to terminate him and his request for medical leave. However, Larson has presented evidence Oregonian's proffered justification for terminating him was based, in part, on his chronic eye issues and resulting deficiencies. Accordingly, Oregonian's motion for summary judgment is[2] granted with regard to Larson's claims for violation of the FMLA and The OFLA, and for wrongful discharge, and denied with regard to Larson disability claims under the ADA and ORA.

*Preliminary Procedural Matter*

Oregonian moves to strike portions of Larson's declaration, arguing discrepancies between statements in Larson's declaration and his earlier deposition testimony establish the statements are "sham" testimony. The Supreme Court has recognized the "virtual unanimity" of circuit courts that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). The

---

[1]In his brief filed in opposition to the motion for summary judgment Larson agreed to dismiss his claim for age discrimination under OR. REV. STAT. § 659A.030. (Pl.'s Resp. to Deft.'s Mot. for Summ. J., ECF No. 31, at 5 n.1.)

[2]The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

Ninth Circuit follows this rule, reasoning that: "'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (internal citations omitted) (quoting *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1462 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986)). *See also Noga v. Costco Wholesale Corp.*, 583 F. Supp. 2d 1245, 1252 (D. Or. 2008). However, the "rule is in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence" and "'should be applied with caution.'" *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009)(quoting *Sch. Dist. No. 1J v. AcandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993)).

This rule does not extend to cases "in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony. Rather, [the rule is] concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." *Kennedy*, 952 F.2d at 267. "The non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Messick v. Horizon Indus., Inc.,* 62 F.3d 1227, 1231 (9th Cir. 1995). Therefore, the district court must determine whether the contradictory testimony was given in an honest effort to clarify, or was an intentional alteration designed to create a genuine issue of material fact. *Melendez v. Morrow Cnty. Sch. Dist.*, Civ. No. 07-785-AC, 2009 WL 4015426, at *14-15 (D. Or. Nov. 19, 2009)(declaration statements did not directly contradict

prior testimony and, therefore, were admissible to create a genuine issue of material fact).

Paragraph 22 of the Larson declaration provides:

> In April 2016, I had a meeting with Nancy Marquay to discuss Salesforce. She did not accuse me of lack of follow through on Salesforce. She did say, "Now you know you need to get that Salesforce up to date." I told Ms. Marquay that I was having trouble seeing the screen. I [k]now that I had forgotten about this meeting when I gave my deposition as this was the earliest date that I discussed my difficulty in seeing the Salesforce screen.

(Larson Decl. dated July 12, 2018, ECF No. 33, ¶ 22.) Oregonian asserts this statement contradicts Larson's deposition testimony that he could remember only one conversation with his supervisor, Nancy Marquay ("Marquay"), about his eye problems which occurred in July 2016 during a car ride to a sales meeting. Larson claims paragraph 22 is consistent with his testimony he had more than one conversation with Marquay about his eye situation prior to September 27, 2016, but that he could only remember the July 2016 conversation at that time.

The deposition testimony the parties refer to provides:

Q. So on September 27, 201[6], you, in writing, told Nancy that you, quote, may need to have surgery on the 20th, closed quote. Correct?

A. Are you talking about the 27th?

Q. Yes, of September?

A. Yes.

Q. And prior to that, you testified you had one other discussion with her about your eye or your eye situation. Is that correct?

A. Yes.

Q. And --

A. Well, I've had – I had other conversations.

Q.     With Nancy Marquay about your eye prior to September 27th?

A.     Yes.

Q.     Okay, when did you have those, and what was said?

A.     Well, I had said that in – in July, when we were riding together, is when I told.

Q.     Any other conversations with Nancy Marquay about your eye situation or eye problems or needing time off for your eye prior to September 27th, other than the one you just – that you have told me about in July?

A.     Other than when I rode with Nancy, it wasn't a full-blown conversation about – well, it is what it is, but she would tend to backseat drive quite a bit and I would say, "Well, I can't see all that well," or whatever I would say, so that was the conversation.

Q.     Anything other than that with Nancy Marquay, up until September 27th, other than the one conversation you have told me about in July?

A.     Not that I can remember at this point.

(Larson Dep.[3] 195:5-196:12.)

Paragraph 22 does not directly contradict this testimony, but rather clarifies or supplements the testimony by providing details of another conversation with Marquay regarding Larson's eye issues that Larson could not remember at the time of his deposition. However, Paragraph 22 does directly contradict Larson's deposition testimony he told Marquay he had trouble with his vision making it difficult for him to sit in front of a computer screen, sometime between July and September, not in April. Specifically, Larson testified as follows with regard to his discussion with Marquay about the effect of his eye issues on his ability to use Salesforce:

Q.     Did you have any discussion with Nancy Marquay as to your need for

---

[3]Deposition excerpts of the Larson deposition taken on February 20, 2018, are attached as exhibits to the Narus declarations, ECF Nos. 25-1, 37, and Snyder delcaration, ECF No. 40-1.

additional training on Salesforce because you were struggling with parts of it?

A.     Yes.

Q.     What discussions did you have with her?

A.     I told her that I was having trouble seeing and that I had trouble with my vision and it was making it hard to sit in front of a computer screen.

Q.     When did you tell her that?

A.     I told her that in – sometime in between July and September.

Q.     Do you remember when?

A.     Maybe August.

Q.     Of '17?

A.     No. '16.

Q.     And do you remember anything other than what you just told me that you told her?

MR. SNYDER:     About Salesforce?

Q.     BY MR. HARNDEN.     About not being about to see the screen.

A.     I just told her that it made it difficult to do the amount of input that they were asking because of the eye strain, and she had said that – well, that's what I had told her.

(Larson Dep. 56:6-57:4.)

Larson did not reference any other conversations or indicate this conversation about how his eye issues affected his ability to use Salesforce was the only one he could remember. Paragraph 22 is contradictory to Larson's deposition testimony and a clear attempt to establish Marquay knew Larson's difficulties with Salesforce were related, at least in part, to his eye issues well before July,

2016.  Paragraph 22 is sham and will not be considered by the court.

Oregonian argues paragraph 45 of Larson's declaration is sham.  Paragraph 45 provides:

On September 12, 2016, I responded to Nancy Marquay's claim that I had not properly entered data into Salesforce, a customer profile data base.  I told James Doyle that I was having trouble using the program because I would having trouble spending so much time on-screen because of my eyes; the standards were applied inconsistently, and others had trouble keeping up.

(Larson Decl. ¶ 45.)  Oregonian claims this statement contradicts Larson's testimony of the matters

discussed at the September 2016[4] meeting, which provides:

Q.      What did you discuss with Jim Doyle and Nancy Marquay?

A.      Basically about the accounts not being – some of the accounts being not the exact fit for the Salesforce stages, and that's when they were talking about the accounts being larger accounts.

Q.      And that was after you saw the first version of Exhibit 5?  I'm just trying to get a timeline here.

A.      Yes.

Q.      And was it – was that discussion with Jim Doyle and Nancy Marquay related to Exhibit 5 and the requirements of Exhibit 5?

A.      The nature of the conversation obviously was billed to be about that, but was more about just things that I seemed to be – about other things that were on – not on my write-up.

Q.      Let's start with what was on your write-up.  What was discussed either by you or Jim Doyle or Nancy Marquay at that meeting about Exhibit 5 or the performance review?

A.      Very – the Salesforce in terms of – but not in terms of – the number, so to speak, just about you need to have bigger accounts and you don't – you need to not let the accounts happen to you, and you need to get bigger accounts from the get go.  There is some talk about you need to start the month off at

---

[4]Larson testified the meeting occurred on September 12, 2016, while Marquay's notes indicate the meeting between her, Larson, and Doyle occurred on September 9, 2016.

75 percent to goal.

Q.      Who was saying that?

A.      Jim Doyle and – Jim Doyle was doing most of the talking.

Q.      What did you say during that portion that related to Exhibit 5 or any of the requirements of Exhibit 5?

A.      I didn't reference.  I mean, it's your boss's boss who is sitting here and listening.

Q.      Do you remember saying anything about those – those issues, the bigger clients and the earlier production in a month and the other things you just mentioned?

A.      You know, I just know that – you know, since I had this issue with my eye and – I was, you know, missing some work.  I just began to feel like there were other things being looked down upon because I was not able to provide the – or I guess the thought was that I would be missing time and wouldn't be able to bring in the money that I normally did or that – I don't know.

        There was – I mean, for how long that I have been in sales, it felt like some of the comments were just unnecessary or just in a way that was, you know, talking down to me like I hadn't been contributing or something or that I wouldn't be contributing.  I don't know.

Q.      You have told me two things that Jim Doyle said.  One was that you needed bigger clients.  The other was that you needed to move the production to earlier in the month.

        What else did Jim Doyle say to you during that meeting, his words?

A.      That's all I can remember.

Q.      Did Nancy – do you remember anything that Nancy Marquay said?

A.      Like I said, I just remember her not saying much.  And if she did, it wasn't – she had more of a deer in the headlights look.

Q.      Did she say anything your recall at all?  Do you remember anything that she said?

A.     No.

Q.     How long did that meeting take?

A.     Maybe an hour.

Q.     Do you recall anything you said during that meeting?

A.     I explained that – my position again, that I have clients that come up rather quickly. And although it's not what they prefer, it's helping me get to my goal and be an employee on their team that hits their goal and hits their numbers. And I took the advice, I guess you could say, and said that I would try to move those people into a – what they wanted.

(Larson Dep. 174:1-177:5.)

The deposition testimony establishes issues discussed and comments made at a September 2016 meeting between Larson, Marquay, and Jim Doyle, Director of Advertising Sales for Oregonian ("Doyle"), regarding a "write-up" or "performance review." While Larson did not identify his eye issues and resulting problems with Salesforce as items discussed during the meeting during his deposition, he did indicate Salesforce was discussed with regard to his performance deficiencies. Consequently, Larson's description in paragraph 45 of his response to Marquay's complaints about his Salesforce entries is not contradictory to his deposition testimony. Additionally, counsel did not ask Larson what he said at the meeting in general or specifically with regard to Salesforce. Instead, he asked Larson if he recalled anything he said during the meeting, leaving the universe of statements made by Larson during the meeting undefined. It is curious Larson did not testify he told Doyle his eye problems caused him to have issues with Salesforce during the meeting when this fact is relevant to, if not at the core, of this lawsuit. However, heeding the Ninth Circuit's warning to avoid taking credibility and evidentiary issues from the jury unnecessarily, the court finds paragraph 45 is not entirely inconsistent with Larson's testimony, is not sham, and should be considered.

Paragraph 51 of Larson's declaration provides:

On September 27, 2016, I submitted via email written notification to Nancy Marquay that I may have to have surgery on October 20, 2016. I wrote this at the bottom of a weekly performance report that all employees turn in before meeting face to face with their managers. The section at the bottom of this report wants to know of "upcoming time off." (See Marquay Decl., Ex. 12 [Dkt 27-12].) I then had a September 27, 2016, one-on-one meeting with Ms. Marquay. During the meeting, I told Ms. Marquay that I was going to have eye surgery on October 20, 2016. Ms. Marquay did not say anything about it during our time one on one time together.

(Larson Decl. ¶ 51.) Oregonian argues Larson's representation he discussed his surgery with Marquay on September 27, 2016, contradicts his deposition testimony describing his discussions with Marquay about his surgery, which provides:

Q.   On September 27th, you notified Nancy Marquay that you may need to have surgery on the 20th. At some point after that, that you set the surgery date. Correct?

A.   No. I set it before.

Q.   Okay.

A.   Because I knew about it and told The Oregonian in the – I mean, when I wrote – when I wrote in the letter that I may need to have surgery.

Q.   So it wasn't you may need to have surgery, you had scheduled surgery on the 20th, or had you just not scheduled it yet as of September 27?

A.   I believe there was one more appointment to make sure that we were still one.

* * *

Q.   BY MR. HARNDEN: Mr. Larson, between September 27, 2015,[5] when you sent the note to Nancy Marquay that you may need to have surgery on the 20th, closed quote, did you have a discussion with anyone from the Oregonian or with the Oregonian about your surgery or your eye condition up until the day you were terminated?

A.   The week of October or the 3rd or the 7th is when I had spoke with – I had

_____

[5]The date of the note was September 27, 2015, but should have been September 27, 2016.

> spoke with Nancy and just reiterated, talked about it, and then also some of
> my co-workers.

(Larson Dep. 198:24-200:2.)

Larson testified he "reiterated" his need for surgery with Marquay in early October, which implies he discussed this with her previously. His declaration could be viewed to merely clarify when that discussion occurred. In this context, Larson's declaration is not inconsistent with his deposition testimony. However, his statement he told Marquay on September 27, 2016, he "was going to have eye surgery on October 20, 2016," does contradict his testimony that as of September 27, 2016, the scheduled surgery was only a possibility, not a certainty. Larson testified he scheduled the surgery prior to September 27, 2016, but that he needed to make "one more appointment to make sure that we were still on." Additionally, counsel specifically referenced, and even quoted, a note in which Larson stated he "may need to have surgery on the 20th," which contradicts Larson's statement he was "going to have eve surgery on October 20, 2016." Consequently, the court will limit the discussion between Larson and Marquay on September 27, 2016, to the possibility of an eye surgery, not the actuality of an eye surgery.

While not identified by Oregonian as sham evidence, the court *sua sponte* finds paragraph 30 of the Larson declaration directly contradicts Larson's deposition testimony providing the date of the ride along during which he advised Marquay of this eye problems. Paragraph 30 provides:

> On June 6, 2016, when Nancy Marquay went out with me on the sales
> call, I told her that I could not see either the navigation device in the
> car or on my iPhone. I asked Mr. Marquay to hold the iPhone and
> help me with navigation by telling me when the screen directed me
> to turn. Ms. Marquay asked me about my eyes. I told her that I was
> unable to see out of my left eye. I told her that it was if I was trying
> to see under water. Ms. Marquay asked me what was wrong with my
> eye. I told her that I had a chronic problem with both of my eyes. I

told her I had limited vision.  I told her that I had eye surgery before
and I likely needed to have eye surgery again.

(Larson Decl. ¶ 30.)  At his deposition, Larson testified the ride-along occurred in "early to middle

July."  (Larson Dep. 116:15-16.)  Specifically, Larson testified:

> A.     Yes.  In July, I had a – I was on a ride along with her, and that's when I told
> her about my – I told her I had a chronic problem with my eye and that I had
> surgery and that I would be requiring surgery again in the future.  And then
> I also – we discussed that.  She said, "What is it like?"  I said that "It's like
> opening my eye underwater."  And I also talked to her about the problems
> that I had with it.
>
> Q.     Okay.  When in July?
>
> A.     Sometime in July.  I can't be certain.
>
> Q.     Sometime between – was it after the 10th or was it after the 20th or after the
> 25th?
>
> A.     I would say it was in the early, middle – early to middle July.

(Larson Dep. 116:2-16.)

It is clear from the description of the conversations, particularly the comment his condition

made him feel as if he was "underwater," Larson is referring to the same sales call.  Larson's

statement in his declaration the conversation occurred on June 6, 2016, is directly contrary to his

clear deposition testimony the conversation occurred in July 2016.  It appears Larson was trying to

establish Marquay was aware of his eye condition and resulting issues prior to issuing a verbal

warning on July 1, 2016.  The court strikes the reference to June 6, 2016, in the Larson declaration

as sham.

### Background

Oregonian hired Larson as an Account Executive effective December 2, 2013.  (Capodacqua

Decl. dated June 25, 2018, ECF No. 26, Ex. 1.)  In this capacity, Larson was expected to engage in traditional sales activities, such as cold calls to prospective clients, developing relationships, presenting sales pitches, and closing sales of advertising and marketing products offered by Oregonian.  (Capodacqua Decl. ¶ 2, Ex. 2.)  Account Executives also served as members of a larger sales team and assisted in the coordination of sales and the roll out of purchased products. (Capodacqua Decl. ¶ 2, Ex. 1.)

Larson suffers from deteriorating retinas, which is not correctable with prescription lenses or surgery.  (Larson Decl. ¶ 9.)  At the time he was hired by Oregonian, Larson had chronic impaired vision in both of his eyes.  (Larson Decl. ¶ 7.)  Larson did not provide any written notice of his eye problems to Oregonian.  (Larson Dep. 60:9-13.)

Larson has had several surgeries or procedures on his eyes to improve his vision.  (Larson Decl. ¶ 9.)  He took time off in late 2015 or early 2016[6] for a procedure on his left eye and advised his then supervisor, Nancy Marquay ("Marquay"), of the reason for his absence.  (Larson Decl. ¶ 15.) Any time Larson had a day off and was not required to enter data in Salesforce was a rest for his eyes and beneficial.  (Larson Dep. 194:11-20.)  However, Larson never informed anyone at Oregonian he took time off here and there due to his eye issues.  (Larson Dep. 194:11-20.)

Larson's eye condition limits his ability to read printed documents.  (Larson Decl. ¶ 7.)  As a result, he uses a magnifying glass to view documents and did so while working for Oregonian. (Larson Decl. ¶ 7.)  Larson is similarly limited in his ability to read documents on a computer screen.

---

[6]Larson does not provide a specific date for this surgery.  However, he does indicate Dennis Haupt covered his territory in his absence.  As Haupt left the employ of Oregonian in the Spring of 2016, the surgery had to occur after Marquay became Larson's supervisor in November 2015 and before Spring 2016.  (Haupt Decl. ¶ 13; Marquay Decl. ¶ 1.)

(Larson Decl. ¶ 8.)  He has difficulty entering information quickly and accurately due to his trouble seeing the keyboard, as well as letters and numbers on the computer screen.  (Larson Decl. ¶ 8.) While working for Oregonian, Larson was not aware of technology which enlarged documents on a computer screen.  (Larson Decl. ¶ 8.)

Oregonian used Salesforce, a software platform used by Account Executives to "track customer contacts, schedule next steps for an account, and input and save other important information related to an account or prospective account" which allowed other members of the sales team to view interactions with existing accounts or potential clients.  (Marquay Decl. dated June 25, 2018, ECF No. 27, ¶ 2.)  Salesforce separated the sales process into four different phases identified as Opportunity, Discovery, Propose, and Negotiate.  (Marquay Decl. ¶ 2.)  Oregonian required Account Executives to track all clients through the four phases, have a specified number of prospective clients in each phase at a time, and move the prospective clients through the phases in a timely manner.  (Capodacqua Decl. ¶ 2.)  All Account Executives received training on how to access and use Salesforce.  (Larson Dep. 49:18-50:4.)

In a company-wide meeting in the fall of 2015, Oregonian advised Account Executives they were required to use Salesforce, which had previously been utilized to a lesser degree.  (Larson Dep. 43:16-44:7, 47:16-48:15.)  Larson discussed Oregonian's new expectations with regard to Salesforce with his supervisor at the time, David Sandvig ("Sandvig").  (Larson Dep. 48:16-23.)  Larson also advised Sandvig he was having difficulties understanding how to use Salesforce. (Larson Dep. 51:19-24.)  Sandvig agreed the increased emphasis on using Salesforce was a big change.  (Larson Dep. 48:24-49:5.)

A few Account Executives, including Larson, did not like using Salesforce or find it

beneficial to closing sales.  Larson thought Oregonian "seemed to get to a point where Salesforce and the data entry of which was more important than the actual sales itself" and explained "Salesforce isn't going to go out there and sell for you," . . .[y]ou need a real human connection in order to make these sales."  (Larson Dep. 82:16-83:12.)  Larson felt the time he was spending inputting data in Salesforce was affecting his sales.  (Larson Dep. 83:14-17.)  He also did not think Salesforce was beneficial with regard to quick sales, or "one-offs."  (Larson Dep. 85:10-17.)  Co-workers Dennis Haupt and Tommy Takemoto resisted using Salesforce, noting they did not think Salesforce "yielded any results" and constituted "busy work" which decreased the time Account Executives could devote to sales presentations and sales.  (Haupt Decl. dated June 20, 2018,  ECF No. 34, ¶ 11; Takemoto Decl. dated July 12, 2018, ECF No. 35, ¶ 7.)

Marquay became Larson's direct supervisor when Oregonian promoted her to the position of Manager of New Business Development on November 1, 2015. ((Marquay Decl. ¶¶ 1, 4; Marquay Dep.[7] 6:17-22.)  Prior to her promotion, Marquay was an Account Executive selling primarily print advertising.  (Marquay Dep. 12:14-17, 12:23-13:4.)

Marquay met weekly with Larson, as well as the other salespeople she supervised.  (Marquay Decl. ¶ 5.)  Prior to their weekly meeting, each salesperson was expected to complete a template identifying key account activity, sales, losses, items to focus on the following week, percentage of digital and total goal, Salesforce hygiene, upcoming days off, and other notes (the "Template").  (Marquay Decl. Ex. 1.)  During the first few months of 2016, all of the Templates completed for Larson identified "Keep on top of SF" as a key focus item for the following week.  (Marquay Decl.

---

[7]Excerpts of the Marquay deposition taken on February 22, 2018, are attached as Exhibit M to the Snyder declaration, ECF No. 32.

Exs. 1, 2.)  Marquay thought another one of her salespeople, David Gwynn, had a "learning curve" with Salesforce and needed guidance in continuing his Salesforce activity.  (Marquay Dep. 25:9-19.)

In early 2016, Marquay completed an evaluation for Larson's performance in 2015 (the "Review").  (Marquay Decl. ¶ 8, Ex. 3.)  Larson received an overall rating of 3.4, which qualified as "exceeding expectations."  (Marquay Decl. Ex. 3 at 1.)  His lowest score of 2.5, or "needs improvement," was in following the VITAL process and his activity level.  (Marquay Decl. Ex. 3 at 3.)  Marquay praised Larson for his focus on customer goals, his "hunting" talent, and his willingness to participate in digital training but identified his "campaign optimization" and communication with his support teams as areas needing improvement.  (Marquay Decl. Ex. 3 at 3.)  Specifically, Marquay noted:

> Marc, you currently have 25 opportunities identified, 5 in discovery stage and 2 in proposal.  This is below the minimum standard.  Continue to identify opportunities and move them thru the pipeline to maximize your revenue opportunities.  I appreciate that you have cleaned up many of the old/out of date opportunities in Salesforce but you have to continue to identify opportunities and fill your pipeline so that you have opportunities to draw from.  Continue to work with your digital team to keep campaigns on track so you don't lose revenue with cancellations.

(Marquay Decl. Ex. 3 at 3-4.)  Both Marquay and Larson signed the Review on March 17, 2016, acknowledging they had discussed the Review.  (Snyder Decl. dated July 16, 2018, ECF No. 32, Ex. A.)

In April and May, 2016, Marquay sent an email to various members of her team, including Larson, reminding them to update Salesforce first thing every morning and notify Marquay when they were done.  (Marquay Decl. Exs. 4, 5.)  Only one team member accomplished this on April 29, 2016, and no one was consistently updating or emailing Marquay as of May 27, 2016.  (Marquay Decl. Exs. 4, 5.)

Larson recognized he was having issues with Salesforce and contacted Oregonian's Salesforce trainer to discuss his difficulties in the Spring or early Summer of 2016. (Larson Dep. 123:23-124:3.) Larson subsequently took some classes with Oregonian's training staff . (Larson Dep. 125:12-15.) Greg Thompson, training manager for Oregonian employees ("Thompson"), remembers providing one-on-one training to Larson on several occasions, but Larson represents he attended only group sessions. (Thompson Decl. dated January 25, 2018, ECF No. 29, ¶¶ 1, 2.)

During the training sessions, Larson had difficulty seeing the overhead screen used by Thompson and trouble trying to mimic the steps on a laptop. (Larson Decl. ¶ 32.) Larson raised his hand when he was unable to "get[] certain of the functions," but Thompson did not come to where Larson was sitting to provide personal instruction. (Larson Decl. ¶ 32.) Larson never complained to Thompson about eye problems or vision issues affecting his ability to use any software program or otherwise perform his job duties. (Thompson Decl. ¶ 2.)

In a July 1, 2016 memo addressed to "Marc Larson -HR File and entitled "Verbal Warning" ("Warning"), Marquay identified these concerns regarding Larson's performance:

> I need to address some serious concerns regarding your performance in key areas of your job duties: use of Salesforce; reliability; and quality of work.
>
> ○ Salesforce Activity: While[] your activity volume in Salesforce is improving, the average stage duration for Discovery, Proposed and Negotiate greatly exceed the recommended timelines. The recommended time in each stage is a guideline to maintain realistic perspective on whether or not the opportunity is likely to close. As a reminder, those guidelines are as follows:
>
>> ○ Opportunity Identified: 50 less than 90 days
>>
>> ○ Discovery: 7 less than 14 days
>>
>> ○ Propose: 3 less than 5 days

- Negotiate: 5 less than 30 days

Your discovery and proposed opportunities are falling well out of th[ese] dates. For example, as of today your pipeline for the next 90 days shows the following:

- Opportunity Identified: 51 averaging 47 days

- Discovery: 8 averaging 45 days

- Propose: 1 averaging 32 days

- Negotiate: 2 averaging 72 days

Additionally, you have multiple opportunities in Discover phase with revenue attached. Revenue should only be attached to opportunities in Propose or Negotiate phase.

You also have multiple opportunities with no follow up task or event scheduled: Institute for Brain Potential, American Institute of Chiropractors, Main Street Dentistry, Happy Leaf, Shandog.

We have provided frequent and thorough training of our products as well as coached and trained you on consultative selling in order to understand your client's goals and develop an advertising package to help your clients meet and/or exceed their goals. You oped to not take the training for Discovery and appointment setting saying you didn't need it. Your pipeline shows only 2 Discovery/Solution for the next 7 days. We have discussed the minimum requirement of 5 per week and you continue to fall short of this minimum. Making more prospecting calls would give you the opportunity to secure more Discovery Calls.

You are currently at 46% of your June goal and I don't see a viable gap plan in place. You are not staged with enough revenue in your pipeline to hit either June or July. What plan do you have in place to get you there?

Jim requested that you set up a meeting with Kell Alterman after our meeting on May 11th, you and I discussed it again on June 6th, to date there is no appointment pending. This is a great opportunity for an upsell and we are not taking advantage of it.

I have requested that you update your calendar with your meeting activity as well as invite me to all of your meetings. I see very few Discovery or Presentation meetings on your schedule. You need to work to increase your activity.

Moving forward my expectations are:

- Salesforce activities updated and in line with requirements outlined above

- Update calendar with all meetings and invite me to all client meetings

- Prospect a minimum of 2 hours everyday until you have a minimum of 5 Discovery Calls set up every week.  Start the week prior, not the Monday of the weeks that you're scheduling for

- Make 5 Discovery Calls every week

- Have enough sales activity in Salesforce to meet requirements

Utilize the VITAL Process

- Prospecting and Pre-Call Planning

- Discovery and Needs Analysis

- Whiteboard and strategize with the support team to create long term solutions

- Present to client in a timely manner

- Follow-up and fulfill

You need to show improvement immediately.  Your improvement must be sustained and you must perform to standard in all other job requirements, adhering to all company policies and procedures.  Failure to meet the expectations outlined above is likely to result in further disciplinary action up to and including termination.

If there is anything further[] I can do [to] help you achieve your goals I would like to know so that I can help you turn your performance around.

(Marquay Decl. Ex. 6 at 1-2.)

Marquay documented her discussion and follow-up with Larson in the same exhibit.  With regard to Salesforce, Larson explained the "stuff" he is proposing are "1-offs" that close quickly and are not documented in Salesforce, and he had some difficulty adjusting to the changes in Salesforce.

(Marquay Decl. Ex. 6 at 2-3; Marquay Dep. 38:17-19.)  Larson said:

> his biggest problem is with the quantity of opportunities, setting up so many and each
> with tasks and events is too many to manage.  He said that he can't manage 50
> effectively and efficiently – this is too many for him – I asked if we reduced the
> required number of opportunities, would he be able to be more successful, he said
> that he[] would.  I told him that we could work on reducing the number of
> opportunities on a temporary basis and move the number back up as he became more
> comfortable managing existing opportunities.  I told him that if we reduced the
> amount of required opportunities that I would have to see very effective activity on
> every single account.
>
> When I asked "what can you manage effectively"?  He couldn't give me a solid
> number but he wants "to not have anxiety and stress to have 50 at one time.  He said
> "If I'm calling that many people, the amount of time it takes to enter in the 50 people
> that you're going [to] call and they may not be worth anything.  Many are "crap", it's
> a numbers game – A certain percent of the prospects will not be worth acting on, he
> doesn't like having to enter the calls if . . . they aren't worth following up on.
>
> "Details fall by the wayside when too many opportunities are in the works."

(Marquay Decl. Ex. 6 at 3.)

With regard to selling, Marquay suggested Larson request a prospect list of top medical
accounts not currently in Salesforce, offered to work with him to identify and move past "hang ups,"
discussed a better approach to process opportunities and organize his day, attended a discovery call
after which she offered to review billing statements to provide him a working knowledge of how
they should look, and identified other resources available to him.  (Marquay Decl. Ex. 6 at 3.)
Marquay noted Larson failed to set up a white board for a prospective client as directed, and
acknowledged Kell Alterman was not receptive to Larson's attempts to set up a meeting.  (Marquay
Decl. Ex. 6 at 3.)  Under the heading "Next Steps," Marquay wrote:

> Reiterated that he has to update SF every day!  Look ahead to dates and events and
> activities so they don't end up on the past date report.  I told him to close [th]ose and
> set up a new opportunity – on stalled opportunities that he thinks may "eventually"
> run to avoid the long stage duration that we are currently seeing.  He is worrie[d] that

someone will "get" his accounts if he closes an opportunity. I told him that he could avoid that by setting a task or event and showing that he is working on the account.

Used the example from Best lawyers, they run an annual insert. He is already working on it for this September but there is no call or activity logged. Reiterated that even though this is an insert, there should still be an opportunity and a call logged, especially if he doesn't want "someone to get it". The best way to ensure that this doesn't happen is to actively work any account that he plans to keep.

(Marquay Decl. Ex. 6 at 3-4.)

Larson did not see or know of the Warning before it was produced during discovery in this lawsuit. (Larson Decl. ¶ 34.) Marquay does not remember if she told Larson she was giving him a formal verbal warning or that the warning would be placed in his personnel file. (Marquay Dep. 42:9-14.) Donna Capodacqua ("Capodacqua"), who began working as the director of human resources for Oregonian on September 12, 2016, testified Oregonian did not provide copies of verbal warnings to employees prior to her hiring. (Capodacqua Decl. ¶ 1; Capodacqua Dep.[8] 5:23-6:3, 28:11-17, 34:13-15.) Hallie Janssen, Oregonian's Vice President of Sales and Marketing ("Janssen"), was not surprised Larson did not know he had been given a verbal warning. (Janssen Decl. dated June 25, 2018, ECF No. 28, ¶ 1; Janssen Dep.[9] 36:2-4.)

Larson discussed his chronic eye problems, previous surgeries, and likelihood of another surgery, with Marquay during a ride-along sometime in July 2016. (Larson Dep. 116:2-4.) Larson explained he couldn't see well out of one eye and felt like he was seeing underwater. (Larson Dep. 116:7-8; Marquay Dep. 26:13-19.) Marquay remembers observing Larson having difficulties using

---

[8]Excerpts of the Capodacqua deposition taken on February 23, 2018, are attached as Exhibit N to the Snyder delcaration, ECF No. 32.

[9]Excerpts of the Janssen deposition taken on February 22, 2018, are attached as Exhibit L to the Snyder declaration, ECF No. 32.

his GPS and offering to help but could not remember when. (Marquay Dep. 26:13-21.) Sometime after this conversation, Marquay again offered to temporarily reduce the target number of opportunities Larson needed to identify in Salesforce but never provided Larson with the reduced number. (Larson Decl. ¶ 31.)

Larson also testified he informed Marquay during a conversation between July and September 2016, likely in August, about his challenges with Salesforce as a result of his eye problem. (Larson Dep. 56:6-20.) He explained he "was having trouble seeing and that I had trouble with my vision and it was making it hard to sit in front of a computer screen." (Larson Dep. 56:11-20.) He asked Marquay if she could lower his number of required entries in Salesforce as an accommodation for this eye problem. (Larson Dep. 56:6-57:14.) Larson's difficulty seeing the computer screen and resulting challenges updating Salesforce meant the information in Salesforce did not accurately reflect the work Larson was doing. (Larson Decl. ¶ 28.)

During a September 7, 2016 meeting, Larson again informed Marquay his eye condition interfered with his ability to use Salesforce effectively and requested some accommodation. (Larson Decl. ¶ 40.) Marquay indicated she would talk with Doyle and recommend lowering the number of Salesforce entries required of Larson. (Larson Decl. ¶ 40.) Marquay never provided Larson with a decreased number. (Larson Decl. ¶ 40.)

The next day, Marquay provided a draft Performance Improvement Plan dated September 7, 2016 (the "Plan"), to Larson for review. (Marquay Decl. Ex. 9 at 1.) At that time, the Plan provided:

> As we have been discussing each week I have ongoing concerns about your performance.

We have been discussing performance issues in key areas of your job duties: use of Salesforce; follow-through; and quality prospecting.

**Salesforce**

While your use of Salesforce has improved, the average stage duration for Discovery, Proposed and Negotiate greatly exceed the recommended timelines.

As of 9/2 your pipeline for the next 90 days shows

- Opportunity Identified: 32 averaging 90 days (with 7 over 100 days; this should be 50 less than 90, As you know I reduced to 32 for you in July as you said that would enable you to catch up.)

- Discovery: 5 averaging 111 days (this should be 7 averaging 14)

- Propose: 3 averaging 22 days (this should be 3 averaging 5)

- Negotiate: 1 averaging 23 days (this should be 5 averaging 30)

We have provided frequent and thorough training of our products as well as coached and trained you on consultative selling in order to understand your clients' goals and develop an advertising campaign to help your clients meet and/or exceed their goals. You opted to not take the training for Discovery and appointment setting saying you didn't need it. Your pipeline shows only 2 Discovery/Solution for the next 14 days. We have discussed the minimum requirement of 5 per week and you continue to fall short of this minimum. We discussed make more prospecting calls to give you the opportunity to secure more Discovery Calls.

**Follow Through**

Your follow through needs to improve. As an example:

- Jim requested that you set up a meeting with Kell Alterman back in May; you and I have discussed this on multiple occasions during our 1:1s; however, to date, there is still no appointment pending. This is a great opportunity for an upsell and we are not taking advantage of it.

- I have requested that you update your calendar with your sales calls and meeting activity as well as invite me to all of your meetings but you still have very few Discover or Presentation meetings on your schedule.

- We met with Employer Health on July 22nd, we held the Whiteboard August

10th. August 15th I spoke to the client to schedule a presentation meeting because he hadn't hear from you. I requested a presentation to review. I received a copy of the proposal on August 29th with no recommendation page, I finally received the complete recommendation the morning of August 30th. After we met with the client on August 30th, they gave us additional information and asked for a recommendation that they court review and move forward to Allen. To date I don't have another recommendation from you. On 9-6-16 I asked for an update on this recommendation and haven't heard back since.

• We met with MK Distinctive Dentistry on August 18th. Patty was collecting information for Dr. Kaip and requested that we come back with a recommendation. Patty scheduled a follow up meeting for September 13th. I have asked what the status of the presentation for Dr. Kaip is and I asked you to follow up with me by end of day September 6th, I still don't have an update or a presentation to review.

**Quality Prospecting**

We have discussed pre-call planning and the use of Buzzboard, Marketing and additional resources to get better and more qualified discovery calls.

• As example, on July 5, I was trying to assist you on processing opportunities and organizing your day. You told me that you called on "some" Marijuana accounts from Willamette Week. At that time, we discussed the need for a more organized approach. I still don't . . . see you putting opportunities in Salesforce, which would help you track the accounts you've called on.

**To reiterate, my expectations are:**

• Salesforce activities updated and in line with requirements outlined above,

• Prospect a minimum of 2 hours every day in the office until your have a minimum of 5 Discovery Calls set up every week. Start the week prior, not the Monday of the week that you're scheduling for.

• Update calendar with all meetings and invite me to all client discovery, whiteboard and presentation meetings.

• Prepare presentations in advance of client meetings so that we have the opportunity to review prior to presenting to the client.

You need to show improvement immediately. Your improvement must be sustained

and you must perform to standard in all other job requirements, adhering to all company policies and procedures. Failure to meet the expectations outlined above is likely to result in further disciplinary action up to and including termination.

If there is anything further I can do to help you achieve your goals I would like to know so that I can help you turn your performance around.

(Marquay Decl. Ex. 9 at 1-2.) The Plan provided a line for Marquay's signature and date, and a line for Larson's signature and date. Between the signature lines was the following language:

Your signature below indicates that this issue has been discussed with you and that you understand the reason(s) for the action being taken. It does imply agreement. Unsigned forms will be noted as such and retained in your employee file. This document does not alter the at-will employment relationship in any way.

(Marquay Decl. Ex. 9 at 1-2.)

Initially, Larson planned to sign the Plan without reading it, but then complied with Marquay's request he review it. (Marquay Decl. Ex. 10 at 1.) Larson became angry while reviewing the Plan, contesting every point in the Plan and claiming most of the Plan was inaccurate, and refused to sign it. (Marquay Decl. Ex. 10 at 1; Larson Decl. ¶ 41.) Larson asserted he had taken the training recommended by Marquay despite her statement he had not, and told Marquay if she was coming after him, she better get her facts straight. (Marquay Decl. Ex. 10 at 1.) He also objected to his Opportunity Identified requirement, complaining Marquay had never provided him with a revised number. (Marquay Decl. Ex. 10 at 1.) Larson asked if anyone "higher up" had participated in creating the Plan and, if so, he wanted to talk to them. (Marquay Decl. Ex. 10 at 1.)

Larson expressed disappointment in Marquay, questioned her management experience, claimed the Salesforce requirements were inconsistently enforced, and asked if Marquay could "make it go away." (Marquay Decl. Ex. 10 at 1.) Marquay felt Larson was "trying to pick everything in the [Plan] apart," was yelling and very angry, and was attacking Marquay personally.

(Marquay Decl. Ex. 10 at 1.)

The next day, Larson met with Marquay and Doyle in Doyle's office. (Marquay Decl. Ex. 10 at 1.) Larson was much calmer and interacted primarily with Doyle, who explained the need for Larson to start his month closer to 75% to goal, instead of 15% to goal, to avoid having to dig out of a deficit every month. (Marquay Decl. Ex. 10 at 1.) In her notes of the meeting, Marquay noted:

> [Doyle] reiterated that sales performance and the utilization of Salesforce and the appointment setting, discovery process will be what position[s] Marc to be more successful. I reiterated that [Doyle] and I are here to help him be successful in any way that we can. Marc expressed frustration in getting help from support team members, he said that they are all too busy and that he doesn't have anyone to go to now that we don't have SDIC's. We have a follow up meeting scheduled for Friday, September 16, 2016[,] to discuss sales strategies and upsell opportunities for existing clients.

(Marquay Decl. Ex. 10 at 1.)

Larson informed Doyle of his eye problems and resulting vision limitations, as well as how those limitations effected his ability to use Salesforce. (Larson Decl. ¶ 43.) Specifically, Larson "told James Doyle that [he] was having trouble using the program because [he] was having trouble spending so much time on-screen because of [his] eyes." (Larson Decl. ¶ 45.) He also responded to Marquay's comments about specific prospective or existing clients, explaining the circumstances and justifying his actions. (Larson Decl. ¶¶ 46-48.) In response to Doyle's stated desire that all team members make five face-to-face meetings per week, Larson informed Doyle he was unable to get five people to meet with him each week and others were having the same difficulties. (Larson Decl. ¶ 49.)

Marquay revised the Plan in response to Larson's complaints. She removed the reference to "32" in the sentence discussing a reduction to required number of opportunities, instead stating:

"As you know I **temporarily reduced the require[d] number of opportunities** for you in July as you said that would enable you to catch up." (Marquay Decl. Ex. 11 at 1, new language in bold.) She also eliminated the sentence "You opted not to take the training for Discovery and appointment setting saying you did not need it." (Marquay Decl. Ex. 11 at 1.)

Marquay met with Larson on September 12, 2016, to review the revisions to the Plan. (Marquay Decl. Ex. 10 at 1.) Larson expressed concern that one mistake would result in his termination and Marquay asserted him she would provide assistant if he struggled. (Marquay Decl. Ex. 10 at 1-2.) Both Marquay and Larson executed the revised Plan on September 12, 2016, with additional notations and comments by Larson. (Marquay Decl. Ex. 11.) Larson altered the final sentence in the next to last paragraph to read: "Failure to meet the expectations outlined above is likely to result in **a plan to get me the help I need to achieve/meet the desired expectations, if there is still failure to meet these expectations then** further disciplinary action up to and including termination. (Marquay Decl. Ex. 11 at 1, new language in bold.) He also underlined the sentence: "It does not imply agreement" in the paragraph above his signature. (Marquay Decl. Ex. 11 at 2.) Finally, he added the following language under his signature:

> There are parts of this document I do not agree to and it should be noted that there were parts of the original document hat were removed from this document.
>
> My goal is to continue to work for the Oregonian Media Group and to meet/exceed their expectations. I don't know if the expectations are the same for everyone in the team, but Nancy has reassured me that if I don't hit the expectations 100% of the time I can come to her and get the help I need in order to do so.

(Marquay Decl. Ex. 11 at 3.)

Coincidently, on September 12, 2016, John Maher, Chief Operating Officer of Oregonian ("Maher"), directed Capodacqua to work with Janssen on a reorganization of the Oregonian's

advertising department. (Capodacqua Decl. ¶ 6; Doyle Dep.[10] 76:23-25.) Maher, concerned about the advertising departments return on investment, intended to decrease the number of Account Executives, who regularly worked out of the office finding new business, and increase the number of in-office employees to service customers, identified as Account Managers or Inside Account Executives. (Capodacqua Decl. ¶ 6.)

Capodacqua and Janssen decided to terminate five Account Executives. (Capodacqua Decl. ¶ 6.) Over the next eight days, Janssen, Capodacqua and Maher created a formula to assess the advertising staff's performance and identify individuals to be terminated or reassigned. (Capodacqua Decl. Exs. 3-5.) The assessment criteria was pulled out of Salesforce, and included things like pipeline management and number of discoveries and opportunities. (Capodacqua Dep. 35:5-16.) Capodacqua explained: "We wanted anything to be as quantifiable as it could be with as little subjectivity as possible, so yes, we wanted numbers." (Capodacqua Dep. 36:2-7.)

The end formula for Account Executives considered consultative selling, results orientation, negotiation, and prospecting and networking, and considered a previous rating of Account Executives in October, 2015. (Capodacqua Decl. Ex. 4 at 1-2.) Once the formula was set and the quantitative data populated, Janssen requested qualitative assessments of sales staff from various directors, including Doyle, by email on September 23, 2016, with specific instructions the assessments were confidential and should not be shared with managers. (Capodacqua Decl. Ex. 7 at 1.) The qualitative assessment for Larson provided "Marc has not consistently engaged with SF and the VITAL process, NCWW, low customer relations rating." (Capodacqua Decl. Ex. 8 at 8.)

---

[10]Excerpts of the Doyle deposition taken on February 22, 2018, are attached as Exhibit K to the Snyder declaration, ECF No. 32.

Janssen informed the directors the quantitative and qualitative assessment would be discussed at the meeting that afternoon and the final assessment compiled by the end of the day. (Capodacqua Decl. Ex. 7 at 1.) Shortly thereafter, Janssen and Capodacqua recommended Larson be terminated and subsequently submitted documentation for the lay offs on September 30, 2016. (Janssen Dep. 21:11-19.) Capodacqua subsequently forwarded the names of the five employees identified for termination to legal counsel. (Capodacqua Decl. Ex. 8 at 1.) Larson was on the list with a termination date of October 26, 2016. (Capodacqua Decl. Ex. 8 at 4.) He was given a score of "2" on the assessment, which ranged from a low of "1" and a high of "5," and was identified as having received written discipline in the past three months. (Capodacqua Decl. Ex. 8 at 7.)

Janssen and Capodacqua were the decisionmakers responsible for identifying Larson as an individual to be terminated. (Janssen Dep. 16:3-24.) Doyle and Marquay did not make the decision to terminate Larson nor directly participate in such decision. (Doyle Dep. 94:24-95:1; Janssen Dep. 17:9-11.) However, Doyle did complete a qualitative assessment which Janssen viewed as a recommendation that Larson be terminated and, according to Capodacqua, had "input" into Larson's termination. (Janssen Dep. 17:4-8; Capodacqua Dep. 44:13-15.) Janssen also used information provided by Marquay such as performance ratings, verbal warnings and written warnings, to rate employees including Larson. (Janssen Dep. 17:25-18:10.) Ultimately, Janssen decided Larson should be terminated because he was not following the sales process and not hitting revenue expectations. (Janssen Dep. 13:24-14:5.) Larson contends he performed well, generally meeting or exceeding his sales goals, and received additional commissions or bonuses in 2016. (Larson Decl.

¶¶ 17-19, 23, 35, 50, 70.)[10]  At the time Larson was selected for layoff, neither Janssen nor Capodacqua were aware of Larson's upcoming eye surgery or that he had any issues with his vision or eyes.  (Janssen Decl. ¶ 3; Capodacqua Decl. ¶ 12.)

In the September 27, 2016 Template provide to Marquay,[11] Larson noted he "[m]ay need to have surgery on the 20th."  (Marquay Decl. Exs. 12.)  Larson subsequently met with Marquay during the week of October 3, 2016, to remind her of his scheduled surgery and explain that, depending on the outcome of the surgery, he could be out of work for one to six weeks.  (Larson Decl. ¶ 52.)  Marquay advised Larson to apply for medical leave under the FMLA and for short-term disability.  (Larson Decl. ¶ 52.)  At some point in late September or early October 2016, Marquay stopped by Capodacqua's office and informed her "Marc may reach out to you about family medical leave because he's having surgery on his eye.  Right now he anticipates only needing a day or two, but it might be longer."  (Capodacqua Dep. 31:15-32:7.)

Larson again stated he may need to have surgery on the 20th in his October 11, 2016 Template.  (Marquay Decl. Ex. 14.)  That same day, Larson informed Marquay and Doyle by email he had eye surgery scheduled on October 20th, and he needed to take off that and the following, day.  (Marquay Decl. Ex. 13 at 1.)  Marquay told Larson to request the PTO in the system and she would approve it.  (Marquay Decl. Ex. 13 at 1.)  She also asked Larson to let her know what coverage he needed so she could arrange to take care of whatever needed to be done.  (Marquay Decl. Ex. 13 at 1.)

_____

[10]  Larson received small bonuses in January and March 2016 ($200 and $505 respectively), and larger bonuses in August and September ($2,427 and $1,932 respectively).  (Marquay Decl. Ex. 7.)

[11]The September 27, 2016 Template is mistakenly dated September 27, 2015.

In the October 16, 2016 Template, Thursday the 20th and Friday the 21st were listed as Upcoming PTO/Days off. (Marquay Decl. Ex. 15.) Under "Notes," someone wrote "[H]aven't been setting appointments for next week - eye surgery recovery may take longer - FMLA??" (Marquay Decl. Ex. 15.) Larson and Marquay met on October 18, 2016, for Larson's last one-on-one meeting. (Larson Decl. ¶ 56.) Larson confirmed his upcoming surgery and possible recovery times, advising Marquay he would probably be out for a least a week. (Larson Decl. ¶ 56.) Marquay promised to contact Capodacqua to request information for Larson on short-term disability and FMLA, which Larson subsequently received by email. (Larson Decl. ¶ 56.) Larson did not immediately apply for medical leave or short-term disability because he had to exhaust his paid time off before he could qualify for either benefit. (Larson Decl. ¶ 56.)

Marquay advised Capodacqua and Doyle by email on October 18, 2016, under the subject line "Marc - FMLA?", that Larson had just told her he could be off for three to six weeks, depending on the outcome of the eye surgery. (Marquay Decl. Ex. 16.) Capodacqua recommended waiting for the outcome to determine the next steps. (Marquay Decl. Ex. 16.)

Larson had left-eye surgery on October 20, 2016. (Larson Decl. ¶ 57.) On October 24, 2016, Marquay contacted Larson by telephone to discuss who would be handling Larson's job duties while he recovered. (Larson Decl. ¶ 58.) Larson informed Marquay he had a follow-up appointment on October 26, 2016, during which he would learn when he could return to work. (Larson Decl. ¶ 58.) At the follow-up appointment, Larson learned he would not be released for work until November 4, 2016. (Larson Decl. ¶ 60.) Larson returned a phone call from Doyle when he returned home and learned his position had been eliminated. (Larson Decl. ¶ 60.) Doyle asked Larson to call Capodacqua to discuss his severance package, and make arrangements for Larson to pick up his final

paycheck and return his company equipment.  (Larson Decl. ¶ 60; Capodacqua Decl. ¶ 19.)

Larson forwarded an FMLA form covering the time he was recovering from his eye surgery to Capodacqua on November 1, 2016.  (Larson Decl. ¶ 62; Snyder Decl. Ex. C.)  That same day, Larson made inquiries about his short-term disability benefits.  (Larson Decl. ¶ 63.)  On November 4, 2016, Larson received word his short-term disability ended on October 27, 2016.  (Larson Decl. ¶ 65.)  Larson followed-up on his FMLA request on November 11, 2016, and was informed by Capodacqua the following day that nothing beyond October 26, 2016, would be approved.  (Larson Decl. ¶ 67.)

On November 23, 2016, Larson forwarded to Capodacqua by email a letter authored by Mehrdad Lalihi, MD, at the Casey Eye Institute dated November 21, 2016, stating: "Marc W Larson was seen at the Casey Eye Institute on November 9, 2016.  I expect him to be able to return to work. Please do not hesitate to contact me if I could be of further assistance."  (Snyder Decl. Ex. I; Larson Decl. ¶ 69.)  Capodacqua advised Larson by email on November 27, 2018, his employment with Oregon ended on October 26, 2018.  (Snyder Decl. Ex. J.)

*Legal Standard*

Summary judgment is appropriate where  the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a) (2018).  Summary judgment is not proper if material factual issues exist for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts

which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2017). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I. Medical Leave Acts

In his First and Second Claims for Relief, Larson alleges Oregonian violated the FMLA and

The OFLA by interfering, discriminating, and retaliating against him for taking medical leave. The FMLA and the OFLA allow eligible employees to take twelve workweeks of leave per year to care for their own serious health condition. 29 U.S.C. § 2612(a)(1)(D) (2018); OR. REV. STAT. § 659A.162(1) (2017). Employers are not allowed to deny or in any way interfere with an employee's right to take leave under either the FMLA or The OFLA. 29 U.S.C. §2615(a) (2018); OR. REV. STAT. § 659A.183 (2018). The Oregon legislature specifically directed the OFLA "shall be construed to the extent possible in a manner that is consistent with any similar provisions of [FMLA.]" OR. REV. STAT. § 659A.186(2) (2017). Accordingly, the court will address Larson's First and Second Claims for Relief together.

Larson alleges Oregonian terminated him because he took medical leave. A claim alleging termination based on the exercise of FMLA rights is as an "interference" claim actionable under 29 U.S.C. §2615(a). *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001); *Peterson v. Tri-County Metro. Transp. Dist. of Oregon*, No. CV 06-1828-ST, 2008 WL 723521, at *9 (D. Or. Mar. 14, 2008). To establish a *prima facie* case of FMLA interference, a plaintiff must prove, by a preponderance of the evidence, that: "(1) the plaintiff took or requested protected leave; (2) the employer subjected the plaintiff to an adverse employment action; and (3) the taking of or requesting protected leave was a 'negative' factor in the adverse employment decision." *Schultz v. Wells Fargo Bank, Nat'l Ass'n*, 970 F. Supp. 2d 1039, 1053 (D. Or. 2013)(citing *Bachelder*, 259 F.3d at 1125). A claim may be proved through "direct or circumstantial evidence, or both." *Bachelder*, 259 F.3d at 1125.

There is no dispute Larson requested protected leave when he notified Marquay of his need for time off for his eye surgery. *See Bachelder*, 259 F.3d at 1130 ("Employees need only notify their

employers that they will be absent under circumstances which indicate that the FMLA might apply."). Additionally, Oregonian's termination of Larson clearly qualifies as an adverse employment action. Consequently, only the question of causal relationship remains.

"An employer's knowledge that the plaintiff engaged in protected activity or the proximity in time between the protected activity and the allegedly retaliatory employment decision can support an inference of causation." *Schultz*, 970 F. Supp. 2d at 1054. Oregonian argues Janssen and Capodacqua, the individuals who made the decision to terminate Larson, were not aware of Larson's request for FMLA leave at the time of the decision. As a result, Larson's protected activity was not a negative factor in his termination.

The record makes clear Janssen and Capodacqua identified Larson as an individual to be terminated. Both Janssen and Capodacqua testified they were not aware of Larson's upcoming eye surgery at the time the decision was made to terminate him. Larson fails to offer any evidence contrary to this testimony. However, Larson argues Doyle and Marquay's knowledge of Larson's condition and request for FMLA leave should be imputed to Janssen and Capodacqua based on what is known as the "cat's paw" theory of liability.

Under the Ninth Circuit's version of the "cat's paw theory," a subordinate's bias is imputed to a decisionmaker if the plaintiff can show the adverse employment action was not independent of the subordinate's bias. *Poland v. Chertoff*, 494 F.3d 1174, 1182-83 (2007). The court explained:

> if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.

\* \* \*

> Thus, if an adverse employment action is the consequence of an entirely independent investigation by an employer, the animus of the retaliating employee is not imputed to the employer. Conversely, even if the biased subordinate was not the principal decisionmaker, the biased subordinate's retaliatory motive will be imputed to the employer if the subordinate influenced, affected, or was involved in the adverse employment decision.

*Id.* (internal citations omitted).

To the extent Larson relies on the cat's paw theory in support of his claims under the FMLA and the OFLA, he fails. Oregonian's identification of individuals to be discharged was based, primarily, on objective criteria obtained through Salesforce. Once Larson was identified using objective criteria, Janssen and Capodacqua sought a qualitative assessment from Doyle on September 23, 2016. There is no evidence Doyle was aware Larson requested FMLA leave prior to October 18, 2016. Consequently, any assessment by Doyle on September 23, 2016, could not have been based, in any way, on Larson's protected activity. The Review, Warning, and Plan prepared by Marquay and considered by Janssen were also all prepared prior to Larson's request for FMLA leave and could not be viewed as biased or retaliatory based on such request. Janssen and Capodacqua were not influenced or affected by retaliatory motives of either Doyle or Marquay.

Larson has also failed to present evidence supporting a causal relationship based on temporal proximity. Larson was initially identified as an employee to be considered for termination before Larson first mentioned the possibility of surgery to Marquay on September 27, 2016. The decision to terminate Larson was solidified on September 23, 2016, after receiving Doyle's input. To infer causation from timing alone, the protected activity must precede the adverse employment action. *Villiarimo v. Aloha Island Air. Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). Here the adverse

employment action was in place before Larson engaged in protected activity. That Oregonian did not inform Larson of the adverse employment decision until after he requested protected leave is of no consequence. *See Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 797 (9th Cir. 1982)("An employer who has decided upon a new policy is not guilty of unlawful retaliation simply because it proceeds with the implementation of that policy after learning that one of the employees who will be affected thereby has recently engaged in protected activity.")

Larson has failed to offer evidence the decisionmakers knew of his protected activity or relied on subordinates with retaliatory motives when they decided to terminate Larson, or that the decision was made after Larson engaged in protected activity. Consequently, Larson has failed to establish a causal relationship between an adverse employment decision and his protected activity. Oregonian is entitled to summary judgment on Larson's claims alleging violations of the FMLA and the OFLA.

## II. Wrongful Termination

In support of his Third Claim for Relief, Larson alleges Oregonian terminated him in retaliation for exercising his rights under the FMLA and the OFLA. Oregonian argues the absence of a causal connection between Larson's protected activity under the FMLA and The OFLA and Oregonian's decision to terminate is fatal to Larson's wrongful termination claim. The court agrees.

Generally, an employer may fire an at-will employee at any time and for any reason, unless doing so violates a contractual, statutory or constitutional requirement. *Patton v. J.C. Penney Co.,* 301 Or. 117, 120 (1986). Oregon law recognizes two narrow exceptions to this rule. The first is when an employee is discharged for exercising a job-related right of important interest. The second is when the plaintiff is discharged for complying with a public duty. *Draper v. Astoria School Dist. No. 1C,* 995 F. Supp. 1122, 1127 (D. Or. 1998) (citations omitted). Invoking rights to benefits under

the FMLA and the OFLA is an employment-related right that may serve as the basis for a wrongful discharge claim. *Washington v. Fort James Operating Co.,* 110 F. Supp. 2d 1325, 1334 (D. Or. 2000); *Yeager v. Providence Health System Oregon,* 195 Or. App. 134, 142–43 (2004).

To succeed on a claim for wrongful discharge based on the exercise of a job-related right, an employee must show that they engaged in protected activity and that the protected activity was a substantial factor in the decision to terminate the employee. *Holien v. Sears Roebuck and Co.,* 298 Or. 76, 90 n.5 (1984). In other words, an employee must establish a "causal connection" between the employment-related right and the adverse employment action. *Pascoe v. Mentor Graphics Corp.,* 199 F. Supp. 2d 1034, 1053 (D. Or. 2001)

The court has already determined Larson's request for protected leave was not a 'negative' factor in the adverse employment decision. This finding disposes of Larson's wrongful discharge claim as well.

III. Disability Discrimination

In his Fourth and Fifth Claims for Relief, Larson alleges Oregonian discriminated against him because of his eye issues and resulting impaired vision by failing to reasonably accommodate his disability and terminating him.[12] Oregonian moves for summary judgment on both claims, arguing Larson fails to establish a causal connection between his disability and the adverse employment action or that Oregonian's proffered justifications for the adverse employment action was pretextual.

When analyzing discrimination claims under the ADA and the ORA, the Ninth Circuit

_____

[12]Larson also alleges Oregonian engaged in disparate treatment and subjected Larson to a hostile work environment based on his disability. Larson does not argue these adverse employment actions in his opposition brief, impliedly conceding his disability discrimination claim on these grounds.

applies the *McDonnell Douglas* burden-shifting framework. *Snead v. Metro. Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1093 (9th Cir. 2001). Under *McDonnell Douglas*, once a plaintiff has made his *prima facie* showing of discrimination, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant successfully offers a valid justification for the employment action, the plaintiff must then demonstrate the proffered reason is pretextual. *Id.* at 804.

To support a *prima facie* case of employment discrimination, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and his disability. *Hutton v. Elf Atochem N. Am. Inc.,* 273 F.3d 884, 891 (9th Cir.2001).[13] The proof required at the *prima facie* stage for employment discrimination cases "is minimal and does not even need to rise to the level of a preponderance of evidence." *Wallis v. J. R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994); *see also*, *Kinney v. Emmis Operation Co.,* 291 Fed. Appx. 789, 790 (9th Cir. 2007) (applying the standard to a case brought under the ADA).

A causal connection exists between an adverse employment action and a disability when an action is taken "on the basis of" an individual's disability. 42 U.S.C. § 12112 (2018); Or. Rev. Stat. § 659A.112 (2017). The Ninth Circuit has interpreted "on the basis of" to mean "motivated, even in part, by animus based on a plaintiff's disability . . . ." *Head v. Glacier Nw. Inc.,* 413 F.3d 1053, 1065 (9th Cir. 2005). Therefore, a plaintiff may succeed in a disability discrimination claim, even if some of the employer's motivations were legitimate, so long as the employer considered the

---

[13]"The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used in federal law." *Snead,* 237 F.3d at 1087.

employee's disability in making an adverse decision.  *Id.* at 1066.  Causation may be inferred from circumstantial evidence, such as an employer's knowledge of a protected status or temporal proximity between such knowledge and the adverse employment action.  *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987); *see also Grant v. Oregon City School Dist. No. 62*, Case No. 16-cv-02202-YY, 2018 WL 2125991, at *4 (D. Or. April 18, 2018)(applying standard to an ADA case).

The record, viewed in a light most favorable to Larson, establishes Marquay was aware of Larson's eye issues by the Spring of 2016 when Larson informed her he was taking time off for surgery on his eyes.  Additionally, Marquay arguably knew the resulting loss of vision affected Larson's ability to use Salesforce as early as July 2016, when they discussed Larson's chronic eye issues and Marquay offered to reduce the number of targets Larson needed to identify in Salesforce.  Marquay had additional conversations about Larson's disability and resulting challenges with Salesforce, likely in August 2016, but definitely on September 7, 2016.  During both of the latter conversations, Larson Marquay discussed a possible accommodation in the form of a reduced number of required Salesforce entries.

On September 7, 2016, Marquay provided a Larson a copy of the Plan identifying Salesforce as a key area in which Larson was underperforming.  While setting forth the degree to which Larson was deficient in Salesforce, Marquay indicated she had reduced the required opportunities identified from fifty to thirty-two in July despite never informing Larson of such decrease .  Even so, three of the four areas needing immediate improvement apparently related, in some degree, to Salesforce: (1) update activities on Salesforce to meet minimum requirements; (2) prospect a minimum of two hours to ensure a minimum of five discovery calls each week, which would be documented on Salesforce; and (3) update Larson's calendar with any scheduled meeting, also likely documented on Salesforce.

During his September 2016 meeting with Doyle and Marquay, Larson again discussed his eye problems, resulting vision limitations, and difficulties using Salesforce. The only change to the Plan after this meeting was Marquay's removal of a specific number of opportunities Larson was required to document in Salesforce.

There is no evidence either Janssen or Capodacqua knew of Larson's disability, issues with Salesforce, and requested accommodations when they identified Larson for termination. However, it is evident both Doyle and Marquay were aware of Larson's eye issues and resulting trouble with Salesforce. Janssen considered the Warning and Plan, authored by Marquay after she was aware of Larson's disability and based, in large part, on Larson's failure to meet Salesforce requirements, in reaching her decision. Moreover, both Janssen and Capodacqua considered Doyle's qualitative assessment of Larson, made after Doyle was informed of Larson's diminished vision and resulting issues with Salesforce. Consequently, Janssen and Capodacqua's decision to terminate Larson was based, at least in part, on Larson's inability to perform his job duties related to Salesforce based on his eye problems of which Marquay and Doyle were aware.

Judge Marco Hernandez reasoned it appropriate to impute knowledge of a disability from a supervisor to a decisionmaker in this instance in *Davis v. Con-Way Freight Inc.*, 139 F. Supp. 3d 1224 (D. Or. 2015). Davis, an employee who suffered from cancer, was terminated for failing to report damage to a vehicle as required by company policy. *Id*. at 1226, 1230. Davis filed an action against his employer for disability discrimination. Davis's supervisors, but not the decisionmakers, were aware of his cancer diagnosis and resulting difficulties at work. *Id*. at 1226, 1232-33. Judge Hernandez rejected Davis's attempt to impute the knowledge of his supervisors to the decisionmakers, noting Davis was fired for violating a company policy in a manner unrelated to his

disability or any reasonable accommodation and, therefore, did not justify consideration of constructive knowledge. *Id*. at1235. Judge Hernandez then offered the following scenario as an example of when constructive knowledge is warranted.

> Plaintiff was not terminated for illness-related behavior or an illness-related inability to perform his job duties. Had he been fired for one of those reasons, his supervisors' knowledge of his cancer would be relevant because the ADA mandates reasonable accommodation under these circumstances, and, under traditional agency principles, Defendant is assumed to know everything its agents know.

*Id*.

Here, Janssen and Capodacqua decided to terminate Larson based, in part, on poor performance documenting his sales activity on Salesforce, which can be attributed to Larson's diminished vision. Consequently, Marquay and Doyle's knowledge of Larson's eye issues, which could have been accommodated in many ways to help alleviate the poor performance, must be imputed to Janssen and Capodacqua, creating the requisite causal relationship between Larson's eye issues and his termination.

Applying the cat's paw theory to Larson's disability discrimination claim leads to the same conclusion. As mentioned above, "even if a subordinate employee with bias was not the final decisionmaker, the plaintiff can establish a causal link by proving that 'the biased subordinate influenced or was involved in the decision or decisionmaking process.'" *France v. Johnson*, 795 F.3d 1170, 1176 (9th Cir. 2015)(quoting *Poland*, 494 F.3d at 1182.) Janssen and Capodacqua relied on a qualitative assessment of Larson offered by Doyle after learning of Larson's eye issues and resulting problems with Salesforce. Janssen used the Warning and Plan, both prepared by Marquay with knowledge of Larson's diminished vision and the Plan prepared with knowledge of Larson's request for accommodations with regard to Salesforce, in making her decision. As a result, Doyle

and Marquay's knowledge of Larson's eye issues should be considered a factor in Janssen and Capodacqua's decision to terminated Larson for the purposes of causal connection.

Janssen and Capodacqua's reliance on the quantitative date obtained from Salesforce is equally tainted. Larson's eye issues prevented him from being able to use Salesforce effectively without accommodation and resulted in the lower numbers considered by Janssen and Capodacqua. Even assuming Marquay afforded Larson an accommodation by decreasing the Salesforce minimums, there is no evidence Janssen and Capodacqua were aware of such reduction or considered the accommodation when evaluating Larson based on Salesforce data. Therefore, identification of Larson as a poor performer based on Salesforce data was effectively based on Larson's vision problems and was discriminatory.

Larson has established a *prima facie* case of disability discrimination based on his termination. Oregonian offers Larson's performance issues, and specifically his failure to diligently update Salesforce, as its legitimate, non-discriminatory reason for his termination. However, this justification is based on Salesforce data, the Warning, and the Plan, all of which clearly implicate Larson's vision problems. Consequently, Oregonian's proffered reasons for terminating Larson were not nondiscriminatory. Oregonian's motion for summary judgment on Larson's disability discrimination claims under the ADA and the ORA is denied.

*Conclusion*

Oregonian's motion for summary judgment (ECF No. 24) is GRANTED with regard to Larson's First Claim for Relief for violation of the FMLA, Second Claim for Relief for violation of the OFLA, and Third Claim for Relief for wrongful termination, and DENIED with regard to Larson's Fourth Claim for Relief for violation of the ADA and Fifth Claim for Relief for violation

of the ORA.

DATED this 13th day of August, 2018.

_/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge